UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAH MILLS,

Plaintiff,

Civil No. 03-73678
Hon. John Feikens

v.

PATRICIA WILLAMS,
CHERYL AUBUCHON,
COURTNEY MCANUFF,
SUSAN PATALIN,

Defendants.
__________________________________/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Mills brings a First Amendment retaliation claim against four administrators at Eastern Michigan University (EMU), her former employer. She claims that due to her political views and speech these individuals eliminated her position and transferred her to a less desirable job which refused to accommodate her religious obligations. Defendants have brought a motion for summary judgment on these claims. I DENY Defendants' qualified immunity defense, and GRANT Defendants' summary judgment motion on the merits due to Plaintiff's failure to show either an adverse action or causation for the actions against her.

## I. FACTUAL BACKGROUND

Plaintiff worked as a customer service representative in the EMU Academic Advising Center (AAC) from December of 1997 until June of 2003. (Mot. for Summ. J. 2, Pl. Resp. Br. 1.) This department is located on the main campus of EMU in Ypsilanti. In this position she

worked under the management of Defendant Patricia Williams, who was the Director of AAC for this period. (Mot. for Summ. J. 2, Pl. Resp. Br. 1.)

In 2000, Plaintiff became involved with a civic organization called Rally Against Individual Discrimination ("RAID"). (See Pl. Dep. 142:15 - 143:4.) This organization was a civil rights group that operated in the Ypsilanti area, appearing at public events in Ypsilanti to call attention to issues of racial discrimination in the city. (See Pl. Dep. 143:16-18 & 148:23 - 150:7.)

In January of 2001, EMU and the city of Ypsilanti hosted a forum in honor of Martin Luther King ("MLK") on MLK Day. One of the events in this forum was a panel discussion about relations between the city of Ypsilanti and EMU. This discussion was attended by the Mayor of Ypsilanti, Cheryl Farmer, and Defendant Courtney McAnuff, a Vice-President of EMU, but none of the other Defendants were present. (See Pl. Dep. 187:20-23, McAnuff Dep. 12:1-3.) At one point in the discussion, Plaintiff rose to ask a question of Mayor Farmer. The question implied that the city had its own problems with employment discrimination, and questioned how it could help EMU with any discrimination issues. (Pl. Dep. 185:13-23.) Plaintiff allegedly had personal experience with discrimination in Ypsilanti employment, as her mother was an employee in the Ypsilanti City Clerk's office who accused that office of discriminating against her on the basis of race. (See Wilson Dep. 100:7-15, Pl. Dep. 175:21-24.) After the program had ended, Mayor Farmer approached Plaintiff and an argumentative exchange between them commenced. (Pl. Dep. 186:13 - 187:11.) Plaintiff alleges after this incident, her workplace situation changed. Plaintiff believes that Defendant McAnuff may have apologized to the mayor for Plaintiff's actions, (Pl. Dep. 178:23 - 179:1,) but Mr. McAnuff

denies ever doing so. (McAnuff Dep. 12:15-24.) (See also Williams Dep. 8:18 - 10:13 (indicating Williams told Tyrone Wilson she thought McAnuff "was going to apologize to the mayor" for "the MLK incident").) Defendant Williams was informed of Plaintiff's presence at the event. (See Williams Dep. 12:8-11, Williams Dep. 77:20-22.)

Plaintiff continued her activism in the city after this event. She, along with her close, personal friend Tyrone Wilson, attended several Ypsilanti City Council meetings and spoke at them. (Pl. Dep. 150:8-24, Pl. Dep. 190:14-16.) All of the Defendants who knew Plaintiff at this time, however, claim they were unaware of the extent of Plaintiff's continued political activism. (Williams Dep. 77:5-22, McAnuff Dep. 16:11-18.) Plaintiff disputes this, however, relying upon the depositions of Wilson and herself that Defendant Williams consistently criticized Plaintiff's political involvement and counseled against continuing such activity. (See generally Pl. Dep. 176-179.)

In July of 2002, Plaintiff and Wilson sought to assist Leah Harris, a student at EMU, in a grade dispute with a professor. Plaintiff and Wilson were informed by Defendant Williams that their presence would not be permitted in a conference between Ms. Harris, her mother, and the professor in question because the professor did not want them present. (See Williams Dep. 20:4-21.) Defendant Williams also advised Ms. Harris's mother that it would be best if Plaintiff and Wilson were not involved in the conference. (Williams Dep. 16:6-9.) The content of that advice is disputed, as Plaintiff alleges that Defendant Williams recommended her exclusion because of her political activities. Defendant Williams denies this. (See Wilson Dep. 27:4 - 29:3, Gloria Harris Aff.; but see Williams Dep. 20:13-23.)

In 2003, Plaintiff's position in the AAC was eliminated. (Pl. Dep. Ex. 18.) The AAC

was informed by the university that it was required to cut its budget by 5%, which was approximately $40,000 annually, and it was told to submit proposals for how it would do that by a particular date. (See Williams Dep. 56-57.) Defendant Williams, who was the Director of the AAC, decided to cut her budget by eliminating Plaintiff's position. (Williams Dep. 26:2-16.) This position, with a pay-grade of CS-05, had an annual salary of $26,000, and an annual cost of $40,000 to the AAC including employee benefits. (See Williams Dep. 59:21-25.) Plaintiff at the time of her position's elimination was the only customer service representative in the office. (Williams Dep. 29:23 - 30:2.) Defendant Williams determined that the AAC could survive the loss of this employee by having students, who were paid by the Financial Aid department, perform the duties previously performed by Plaintiff. (See Williams Dep. 37:17-24.) Defendant Williams chose not to cut other areas of the AAC budget, including any student advisor positions or the raises she and her deputy received between January 2003 and January 2004, which amounted to approximately $26,000 annually. (Pl. Resp. Br. Ex. 6 (showing increase in pay for Patricia Williams of $14,919 and Robert Salisbury of $10,805).) Defendant McAnuff approved Defendant Williams' decision, and Plaintiff's position was eliminated.[1] (McAnuff Dep. 27:25 - 28:3.) Approximately six months after Plaintiff's position was eliminated, a new customer service representative was hired into the AAC, but that person no longer works there. (Wilson Dep. 34:5-19.) Defendant Williams denies Plaintiff's position was ever re-established in the AAC. (Williams Aff. ¶ 10.)

Instead of being terminated, Plaintiff was transferred to a position with the same pay-

[1]Neither Defendant Patalin nor Defendant Aubuchon were involved in the decision to eliminate Plaintiff's position in the AAC. (Patalin Dep. 31:7-10, see also Aubuchon Dep. 13:4-11.)

grade and job description at the Livonia Continuing Education Offices ("Livonia campus") of EMU. (Pl. Dep. Ex. 18.) Defendant Susan Patalin, EMU's Director of Employment Recruiting and Human Resources, asserts in her deposition that this transfer was done according to the contract EMU had with UAW, the union in which Plaintiff was a member, and that Defendant Patalin told Plaintiff that the contract governed her transfer when she first complained about it. (Patalin Dep. 27:2-23.) This was far from Plaintiff's first choice placement; she sought to be transferred to another job on EMU's Ypsilanti campus and applied to several other departments. (See generally Pl. Dep. 30-35.) She twice made administrative challenges to the elimination of her job, and no wrongdoing was found in either proceeding.[2]

Plaintiff reported to her job on the Livonia campus on July 1, 2003, but did not feel welcome at this new job. (Pl. Dep. 42:12-17.). There were two primary complaints she had about the job on the Livonia campus: (1) the lengthened commute from her home in Ypsilanti, as she is a single mother with two school-age children and the lengthened commute strained the time she could have been personally caring for her children, and (2) the hours of the Livonia campus, which was regularly open until 10:00pm on weekdays and during daytime hours on Saturdays. (See Pl. Aff. ¶¶ 7 & 8, Pl. Dep. 202:21-25.) The evening hours on weekdays were problematic because she could not be present to care for her children when they came home from school, and the Saturday hours were problematic as Plaintiff's religion, Seventh-Day Adventism,

---

[2]Plaintiff filed a charge with the EMU Office of Diversity and Affirmative Action claiming this transfer occurred as a result of discrimination against her due to her political beliefs. The department found no discrimination. (Pl. Dep. 39:9 - 42:11.) Plaintiff then filed a grievance against EMU with the help of her union, and the arbitrator of that grievance found the decision to eliminate Plaintiff's position in the AAC was "made for legitimate business reasons." (Mot. for Summ. J. Ex. I at 14.)

prohibits working on Saturdays. (Pl. Aff. ¶ 13.) The Saturday problem was addressed at the beginning of Plaintiff's employment by not scheduling Plaintiff on Saturdays. (Pl. Dep. Ex. 14 (indicating for the first two months of Plaintiff's employment in Livonia she was not scheduled to work on Saturdays).)

When the fall semester was approaching, Defendant Cheryl Aubuchon, who supervised Plaintiff at the Livonia campus, asserts she requested from Plaintiff written materials regarding her faith's requirement not to work on Saturdays. (See Aubuchon Dep. 25-26.) Plaintiff has no recollection of this request. (Pl. Dep. 199:21-25.) After Plaintiff did not provide these materials to Defendant Aubuchon, she was scheduled to work on Saturdays. (Pl. Aff. ¶¶ 13 & 14, see Aubuchon Dep. 30:13-18.) Before any Saturday in which she was required to work occurred, Plaintiff requested and was granted leave from work for health reasons.[3] She never returned to her job, and EMU terminated her employment for abandonment.[4]

Plaintiff brings this suit against Defendants Williams, Aubuchon, McAnuff, and Patalin pursuant to 42 U.S.C. § 1983 alleging retaliation due to her exercise of her First Amendment rights. (Am. Compl. ¶ 32.) Defendants filed the pending motion for summary judgment

---

[3]On September 2, 2003, Plaintiff requested medical leave in accordance with the Family Medical Leave Act for mental health reasons. (Pl. Dep. 43:6-15.) While on this leave, she dislocated her knee and extended her leave from work. (Pl. Dep. 45:11-17.)

[4]Plaintiff in February of 2004 was advised by an individual in EMU's human resources department that she would have to return to work on February 27. (Pl. Dep. Ex. 1.) Plaintiff replied with a letter indicating that her therapist advised her she should not return to work. (Pl. Dep. Ex. 3.) EMU indicated to her that this letter was insufficient to extend her leave, and that without sufficient documentation she would be considered as having abandoned her job. (Pl. Dep. Ex. 4.) Plaintiff continually tried to contact her therapist with the purpose of extending her leave. (See Pl. Dep. 77:14 - 79:15; 86:17 - 87:11; 88:11 - 90:2; 90:11 - 93:6.) As of March 15 she had not submitted any such documentation, and EMU mailed her a letter indicating her employment was terminated due to her abandonment of her job. (Pl. Dep. Ex. 6.)

November 30, 2006. Oral argument was held before me on January 29, 2007.

## II. ANALYSIS

### 1. Qualified Immunity

Before addressing the merits of the claims, this Court must first address the qualified immunity defense raised by Defendants. Qualified immunity is "an immunity from suit rather than a mere defense to liability." Saucier v. Katz, 533 U.S. 194, 200 (2001) (internal citations omitted). A two prong test exists to determine if qualified immunity applies: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006) citing Saucier, 533 U.S. at 201.

Defendants qualified immunity defense necessarily fails. The allegation made by Plaintiff is that she was fired because of Defendants' hostility to her political expression. Terminating a public employee for political speech made outside of the workplace and unrelated to her employment is a violation of the employee's clearly established First Amendment rights. See Scarbrough v. Morgan County Bd. of Educ., 470 F.3d 250, 263 (6th Cir. 2006) ("[T]he greater the speech's relationship to a matter of public concern and the more minimal the effect on office efficiency the more likely a reasonable person would be to understand that the employer's actions violated the Constitution."); Williams v. Kentucky, 24 F.3d 1526, 1533-38 (6th Cir. 1994). There is little doubt that speech regarding the operation of the city is political speech close to the heart of the Free Speech Clause. See Connick v. Myers, 461 U.S. 138, 145 (1983) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (internal

citations omitted). An employee's right to speak about such matters is "so clear [when the employee speaks] that reasonable minds could not differ on the constitutionality." Scarbrough, 470 F.3d at 263. Defendants' qualified immunity defense therefore must fail, and the merits of the case must be analyzed.

2. First Amendment Retaliation Claim

*A. Legal Standards*

Summary judgment is proper if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. (Fed. R. Civ. P. 56(c).) A fact is material if proof of that fact would establish or refute one of the essential elements of a claim or defense and would affect the application of governing law to the rights and obligations of the parties. Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence and any reasonable inferences drawn therefrom in a light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For a claim to survive summary judgment, the nonmovant must offer more than a mere scintilla of evidence as to the material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The movant's burden is satisfied where there is an absence of evidence to support the nonmovant's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

There are three elements a plaintiff must prove to establish a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983: "(1) [she] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - that is, the adverse action was motivated at least in part by [her]

protected conduct." Scarbrough, 470 F.3d at 255. Once a plaintiff can show these three elements, the defendant must then show "by a preponderance of the evidence that there were other reasons for the adverse action and that the same adverse action would have resulted even if the plaintiff had not engaged in the protected activity at issue." Leary v. Daeschner, 349 F.3d 888, 898 (6th Cir. 2003). Because the defendant's burden after a prima facie case is established is fact-based, granting summary judgment for the defendant on the basis of its defense is improper "unless the evidence is so one-sided that one party must prevail as a matter of law." Id. (internal citations omitted).

*B. Protected Activity*[5]

Plaintiff engaged in constitutionally protected activity. A two prong test exists to determine if speech made by public employees is protected by the First Amendment. "The threshold question is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern." Scarbrough, 470 F.3d at 255. If it does relate to a matter of public concern, "the court employs the balancing test outlined in Pickering v. Board of Education, 391 U.S. 563 (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." Scarbrough, 470 F.3d at 255. If the speech relates only to a matter of private concern, it is not protected and the balancing test need not be applied. See Connick, 461 U.S. at 146.

1. Racial Discrimination

[5]As Plaintiff appears to no longer be arguing that the retaliation was based upon her religious beliefs, but instead her expression and association, I do not analyze whether the exercise of her religion is protected activity. (See Pl. Resp. Br. 1 ("This is a First Amendment retaliation claim ... involving [Plaintiff] ... who was subject to a campaign of adverse action as a result of her protected speech and association.").)

Plaintiff's speech regarding racial discrimination in the city of Ypsilanti is protected. Such speech is clearly a matter of public concern. See Strouss v. Michigan Dep't of Corr., 250 F.3d 336, 346 n.2 (6th Cir. 2001) ("racial discrimination is inherently a matter of public concern"). The fact that Plaintiff's question on MLK Day may have been motivated by perceived discrimination suffered by her mother does not change the very public nature of any claims of racial discrimination practiced by the city government. Leary, 349 F.3d at 899 (finding speech protected when partially of personal concern because "some portion of the speech touches on a matter of public concern") (internal citations omitted). Plaintiff's further activities with RAID also are of public concern, as participation in an association to express opinions regarding a matter of public concern is protected the same as such expression when made alone.

Plaintiff's statements on a matter of public concern should be protected under the Pickering balancing test. There is no evidence that Plaintiff used her position within EMU as a pulpit to express her opinions on the Ypsilanti government. The events at which she spoke were City Council meetings, (Pl. Dep. 150:8-24,) other community events away from EMU's campus, (Pl. Dep. 150:8 - 151:2,) and a city-wide forum on MLK Day. (Pl. Dep. 185:13-23.) None of these events were related to her workplace, nor did her participation in them affect "the efficiency interests" of her employer in the least. Thus, her statements with RAID and at the forum honoring Dr. King are protected activity.[6]

2. Student situation

[6]Defendant argues that this speech cannot be protected activity for purposes of this inquiry because there is no evidence that any of Defendants knew of the speech. This argument is better placed in the causation inquiry than the inquiry regarding whether Plaintiff's activity was protected, however. Thaddeus-X v. Blatter, 175 F.3d 378, 387 n.3 (6th Cir. 1999) (en banc).

Plaintiff's speech regarding Leah Harris was not protected because this speech was solely regarding a matter of private concern. Plaintiff's speech within the office complaining of EMU policy was not meant to be public nor was it regarding anything but the particular student in question. Because this was a matter of private concern, no protection exists under the First Amendment. See Connick, 461 U.S. at 146.

*C. No Adverse Action Occurred*

I find that no adverse action occurred. An adverse action is an action "that would deter a person of ordinary firmness from the exercise of the right at stake."[7] Thaddeus-X v. Blatter et al., 175 F.3d 378, 396 (6th Cir. 1999) (en banc) (internal citations omitted). This test has also been stated as "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities."[8] Id. at 397 (internal quotations omitted) citing Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc) *rev'd on other grounds* 523 U.S. 574 (1998). Purely personal reasons for preferring a former state of affairs over the current state of affairs are insufficient to make a change an adverse action. Strouss, 250 F.3d at 343 n.2 citing Darnell v. Campbell County Fiscal Court, Case No. 90-5453, 1991 WL 11255, at *3, 1991

---

[7]Thaddeus-X was a First Amendment retaliation case, and this test was given in that context. In that case, the Sixth Circuit indicated the term "adverse action is drawn from employment case law." Thaddeus-X, 175 F.3d at 396. Plaintiff asserts in its brief, without the benefit of any citation, that the standard for what constitutes an adverse action is more inclusive for First Amendment retaliation claims than Title VII actions. (Pl. Resp. Br. at 11.) This Court has found no authority to support Plaintiff's assertion and rejects it.

[8]Although several courts have cited dicta in Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 n.8 (1990), for the proposition that "even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights" is sufficient to find an adverse action, the Sixth Circuit has explicitly rejected this dicta. Thaddeus-X, 175 F.3d at 397-98.

U.S. App. LEXIS 1755, at *9 (6th Cir. 1991). "[C]riticisms, accusations, threats, or bad mouthing are not enough." Magley v. Wright, Case No. 5:98-CV-012, 2001 U.S. Dist. LEXIS 4612, at *19 (W.D. Mich. March 30, 2001) (internal citations omitted). "Reassignments without changes in salary, benefits, title, or work hours usually do not constitute adverse employment action." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002); but see Leary v. Daeschner, 349 F.3d 888, 901 (6th Cir. 2003) ("[W]e previously determined that an involuntary job transfer, where neither grade nor salary is affected, qualifies as adverse action for purposes of the First Amendment.") citing Boger v. Wayne County, 950 F.2d 316, 321 (6th Cir. 1991). "[I]ncreased distance from home to a new position" is a factor to be considered in an adverse action inquiry.[9] Policastro, 297 F.3d at 539.

I GRANT summary judgment in favor of Defendants. Plaintiff in her Complaint alleges twelve adverse actions taken by Defendants. After reviewing the briefs and evidence submitted with the summary judgment motion, the potential adverse actions can be discussed in three categories:[10] (1) the elimination of Plaintiff's job and corresponding transfer to Livonia, (2) the

---

[9]Policastro is a Title VII discrimination case that states that increased distance is a factor in a constructive discharge inquiry. Since constructive discharge is a severe adverse employment action, it is also proper to consider the increased distance in an adverse action inquiry.

[10]There are three adverse actions she has alleged that do not fit into any of these three categories: (1) eliminating Plaintiff's opportunity to pursue a Bachelor's degree, (2) issuing false and pretextual discipline against the Plaintiff, and (3) disparaging the Plaintiff to third parties, including parents of students. (Compl. ¶¶ 33(g), 33(i), & 33(l).) The first two both must fail as a matter of law. See Strouss, 250 F.3d at 343 n.2 (indicating no adverse action when is employment change that precludes attending college of choice); Magley, 2001 U.S. Dist. LEXIS 4612, at *19 (finding no adverse action when is written discipline that is never imposed). The third fails as a matter of Plaintiff's own admission. (See Pl. Dep. 139:2-8 (admitting the first alleged adverse action was the termination of the position in the AAC, which occurred after the incident with the mother of Ms. Harris).)

alleged "blacklisting" of Plaintiff from positions on the Ypsilanti campus, and (3) constructive discharge of Plaintiff from employment with EMU.

1. Elimination of Plaintiff's Position and Transfer to Livonia

The elimination of Plaintiff's position and her subsequent transfer to Livonia does not meet the legal requisites to be an adverse action. Plaintiff's reasons for claiming that this transfer was adverse to her are that it was a longer commute, the later hours affected both her ability to be home when her children were out of school and her ability to attend Ypsilanti City Council meetings, and that the prestige of the Livonia campus is not as high as that of the Ypsilanti campus. Plaintiff has introduced no objective evidence that a position as a customer service representative on the Ypsilanti campus is more prestigious than the same position in the Livonia campus; the fact that academic prestige may be greater does not automatically indicate that prestige for customer service representatives is higher. The remaining issues are harder, however. The Sixth Circuit in Leary directly stated that an involuntary job transfer, without change to pay or grade, could be an adverse action. Leary, 349 F.3d at 901. In that case, the court found an adverse action to have occurred when two elementary school teachers were transferred to different schools in their district. Id. at 892-95. However, the Sixth Circuit only a year before its decision in Leary found that an involuntary transfer of an employee that resulted in her having to commute between 80 and 100 miles one way four times per week was not an adverse action after finding that increased commute was a factor to be considered. Policastro, 297 F.3d at 539-40. The increased distance of Plaintiff's commute alone is insufficient to find her transfer an adverse action, as it added only approximately 20 miles to her commute, less than 25% of what the court found insufficient in Policastro. Likewise, Plaintiff's inability to attend

Ypsilanti City Council meetings with the hours she was required to work in her new position is insufficient to find an adverse action. Strouss, 250 F.3d at 343 n.2 (finding inability of Plaintiff to attend college she wished due to transfer was not sufficiently adverse). The Supreme Court has counseled that the need of a parent to care for children may be considered in the inquiry. Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405, 2415 (2006) ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."). The difficulty is not in considering any of these factors individually, but whether together they amount to an adverse action to this Plaintiff. I find they do not. My reason for this conclusion is an emphasis on the objective nature of the inquiry. Strouss, 250 F.3d at 343 n.2 (finding "purely personal reasons" are not enough to make an action adverse). Although I do not dispute that the subjective reasons why Plaintiff preferred her position on the Ypsilanti campus are valid, a reasonable person would not find a transfer to a job with the same pay and benefits only an extra 20 miles away sufficient to deter their exercise of their First Amendment rights. Therefore, I find this transfer is not an adverse action.

2. Alleged Blacklisting of Plaintiff from Positions on Ypsilanti Campus

Plaintiff's claim that she was blacklisted from positions on the Ypsilanti campus due to her political speech must fail. The entirety of Plaintiff's evidence that she was blacklisted rests upon the testimony of Wilson that Defendant Williams told them she knew how to blacklist someone from campus jobs, (Wilson Dep. 21:22 - 22:3,) and that Plaintiff did not obtain any jobs on the Ypsilanti campus when she applied for several. There is no evidence before this Court that any of the Defendants made contact with any other directors in the Ypsilanti campus

regarding Plaintiff's applications. (See, e.g., Patalin Dep. 69.) Without such evidence, Plaintiff's claim that there was an adverse action of her being blacklisted from jobs on the Ypsilanti campus must fail.

3. Constructive Discharge

Plaintiff is unable to provide sufficient evidence that she was constructively discharged from her position in the Livonia campus. The problem with her argument on this point is clear: she never quit her job. To be constructively discharged, "the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." Goldmeier v. Allstate Ins. Co., 337 F.3d 629, 635 (6th Cir. 2004) (emphasis added). Until the very end of her employment, Plaintiff was seeking to keep her job with EMU by extending her leave time. (See, e.g., Pl. Dep. 78:18-21 (indicating she was trying to get her therapist to write to EMU to permit her to extend her leave).) Without the employee actually quitting her job, a claim of constructive discharge from that job must fail.[11]

*D. Plaintiff Fails to Show Any Evidence of Causation*

Even if any of the above actions were adverse, Plaintiff has failed to meet its burden to introduce a dispute of material fact regarding whether her First Amendment protected activity caused any employment action taken by EMU. Plaintiff's only colorable argument of an adverse action is the elimination of Plaintiff's position in Ypsilanti and the corresponding transfer to

---

[11]Plaintiff also includes in her Complaint that she was discharged from her employment and that was an adverse action. (Compl. ¶ 33(l).) This claim of hers must fail on causation grounds, as she has shown no evidence that her employment was terminated for any reason other than her failure to follow EMU's procedures to extend her medical leave.

Livonia. For Plaintiff's constitutionally protected speech to have caused such an adverse action, it is logically necessary that Defendants knew about her political activity. The evidence throughout this case shows that the only activity in which any of the Defendants knew Plaintiff had participated was the question she asked at the symposium honoring Dr. King.[12] (See Williams Dep. 12:8-11, Williams Dep. 77:20-22, McAnuff Dep. 12:1-3.) That occurred over two years before her position in the AAC was eliminated.[13] (Cf. Pl. Dep. 150:8-12 to Pl. Dep. Ex. 18.) The elimination of her position is thus much too attenuated from her protected speech for this Court to find that the speech caused the adverse action alleged. See Holley v. Giles County, 165 Fed. Appx. 447, 452 (6th Cir. 2006) ("[Eleven month] time lag between the speech and the adverse action is a strong indication that the action was not retaliatory."); see also Timm v. Wright State Univ., 375 F.3d 418, 423 (6th Cir. 2004) ("Eight months is a long period of time for an employer to wait to retaliate against an employee with a termination notice."). Thus, because Plaintiff cannot show the required causation between the protected speech and the adverse action, Defendants' motion for summary judgment should be granted.

## III. CONCLUSION

---

[12]Plaintiff asserts that Defendant Williams was aware of Plaintiff's continuing political activity as evidenced by her unceasing counseling of Plaintiff to cease such activity. (See generally Pl. Dep. 176-79.) Nowhere in this evidence can Plaintiff show that Defendant Williams knew of any particular act of Plaintiff's other than the MLK Day event, however. Without proof of Defendant Williams knowledge of any other activity, it cannot be proven that such activity caused the elimination of Plaintiff's job in the AAC.

[13]It is undisputed that Defendant Williams decided to eliminate Plaintiff's position, (Williams Dep. 26:2-16,) and Defendant McAnuff approved her decision. (McAnuff Dep. 27:25 - 28:3.) Therefore, as a matter of causation, if the adverse action is the elimination of her position, summary judgment must be granted in favor of at least Defendants Aubuchon and Patalin as they were not involved in the decision to eliminate her position.

For the abovementioned reasons, I DENY Defendants' qualified immunity defense, and GRANT Defendants' motion for summary judgment on the merits due to Plaintiff's failure to show either an adverse action or causation for the actions against her.

**IT IS SO ORDERED.**

Date: February 26, 2007

s/John Feikens
United States District Judge

Proof of Service

I hereby certify that the foregoing order was served on the attorneys/parties of record on February 26, 2007, by U.S. first class mail or electronic means.

s/Carol Cohron
Case Manager